[No. A047416. First Dist., Div. Four. Oct. 23, 1990.]

SHELL WESTERN E & P, INC., Plaintiff and Respondent, v. COUNTY OF LAKE, Defendant and Appellant.

**COUNSEL**

Cameron L. Reeves, County Counsel, and Douglas H. Calkins, Deputy County Counsel, for Defendant and Appellant.

Pettit & Martin and John P. MacMeeken for Plaintiff and Respondent.

OPINION

POCHÉ, Acting P. J.—Revenue and Taxation Code section 1604, subdivision (c) (hereinafter section 1604(c)) provides that if a taxpayer applies to a county board of supervisors acting as the county assessment appeals board for a reduction in the assessed value of real property, and if the board does not act on the application within two years thereafter, and if the parties have not in writing mutually agreed to extend the two-year period, then the taxpayer's opinion of the property's market value is to be accepted as the basis of the value "upon which taxes are to be levied." On this appeal we address (1) whether there was a writing that extended the two-year period, and (2) whether section 1604(c) establishes a mandatory duty that is to be enforced according to its plain language. Answering the first inquiry in the negative and the second in the affirmative, we find it unnecessary to reach a contention that section 1604(c) is unconstitutional.

## BACKGROUND

At all pertinent times plaintiff Shell Western E & P, Inc., was the lessee of rights to develop and sell the geothermal resources extracted from three parcels of land in the County of Lake owned by the United States. With respect to the 1983-1984 fiscal year, the assessor of the defendant county assessed the value of Shell's possessory interests in the parcels at $77,109,300. In August of 1983 Shell paid the assessed taxes in the amount of $761,065.16. The following month Shell applied to the county's board of equalization for reduction of the assessments to $20,068,400 (which would have reduced Shell's taxes by $562,996.41 to $198,068.75).

The hearing on Shell's applications conducted by the county's board of supervisors acting as the county's board of equalization began in July of 1986 and extended through November of that year, at which time the applications were submitted for decision. Shell's applications were heard in conjunction with similar applications submitted by Sterling Grace Management, L.P., and Grace Geothermal Corporation (hereinafter collectively referred to as Grace), which had purchased Shell's possessory interests in September of 1983. The board rejected Shell's argument that section 1604(c) required that Shell's assessment figures be accepted due to the delay of the hearing, the board finding that the attorney representing both Shell and Grace had executed a written stipulation extending the period for hearing the applications. In January of 1987 the board denied the applications.

Following the county's denial of its claims for refund, Shell initiated this action by filing a complaint for recovery of the $562,996.41 in taxes it

allegedly overpaid. During the course of a bench trial, the court received evidence in the form of testimony and the administrative record of proceedings before the board.[1] Concluding that the purported stipulation was ineffective, and that section 1604(c) not only had been correctly invoked by Shell but was "dispositive," the court entered judgment against the county for $562,996.41 plus interest. The county thereupon perfected this timely appeal.

## REVIEW

## I

As applicable to the various stages of this case, section 1604(c) provided in pertinent part: "If the county assessment appeals board fails to hear evidence on the application for reduction in assessment of property within two years of the timely filing of the application, the taxpayer's opinion of market value as reflected on the application . . . shall prevail as the basis upon which taxes are to be levied, unless the taxpayer and the county assessment appeals board mutually agree in writing to an extension of time for the hearing . . . ."[2]

The parties' briefs begin with the county's challenge to the constitutionality of section 1604(c). They then discuss how the statute should be construed if it is found constitutional. Only in conclusion do they address the sole fact-specific contention before us—whether the board correctly treated Shell as having "agree[d] in writing to an extension of time for the hearing." But this is to go at the problem from the wrong direction. If Shell did agree to extend the hearing, there would be no need either to construe section 1604(c) or to decide its constitutionality. If Shell did not so agree, but its claim for refund can be defeated by reason of statutory construction alone, there would still be no necessity for grappling with any constitutional arguments. Only when these two approaches have been tried and found wanting might there be occasion to examine the county's constitutional arguments. We therefore reverse the parties' analytical sequence in order to find the most narrow basis for our decision.

---

[1] Pursuant to stipulation between the parties, the actions for tax refunds commenced by Grace as well as Shell were consolidated for purposes of trial.

[2] Effective January 1, 1987, section 1604(c) was amended to provide in pertinent part: "If the county assessment appeals board fails to hear evidence and fails to make a final determination on the application for reduction in assessment of property within two years of the timely filing of the application, the taxpayer's opinion of market value as reflected on the application . . . shall be the value upon which taxes are to be levied for the tax year covered by the application, unless the taxpayer and the county assessment appeals board mutually agree in writing to an extension of time for the hearing . . . ." (Stats. 1986, ch. 982, § 28, p. 3401.) This amendment does not alter the substance of section 1604(c) as we construe it here.

The writing at issue is in the form of a stipulation. After hearing extrinsic evidence concerning the circumstances surrounding its drafting and execution, the board made findings to the effect that the stipulation extending the period within which the board could act on the reduction applications of Grace also extended the period for taking action on Shell's applications, notwithstanding the fact that Shell is never mentioned in the stipulation. The board apparently reasoned that because Grace and Shell were jointly represented by the attorney who executed the stipulation, and because the assessment reduction applications of Grace and Shell were being treated as a single matter, "it was the intent that such stipulation applied to both [Shell] and Grace." From this the board concluded that the provisions of section 1604(c) "do not apply." After reviewing the evidence before the board and receiving additional extrinsic evidence, the trial court determined that the board's findings were not supported by substantial evidence. The court further determined that the board's conclusion as to the applicability of section 1604(c) "is an incorrect statement of the law[,] . . . is not supported by law and is . . . contrary to the law . . . because the provisions of Section 1604(c) do apply."

The county contends that the trial court erred in conducting an independent examination of the issue and in not concluding that the board's findings were supported by substantial evidence in the record of proceedings before the board. Ignoring what transpired before the board, Shell claims that the court's findings are supported by "the uncontradicted evidence" introduced at the trial, and that "[t]he question before the Superior Court was one of law." This stark disagreement as to what the court was to decide and on what evidentiary basis that decision was to be made necessitates a brief discussion of the board's decisional powers and the extent of judicial review.

■ The California Constitution specifies that "[t]he county board of supervisors, or . . . assessment appeals boards created by the county board of supervisors, shall constitute the county board of equalization" with the duty to "equalize the values of all property on the local assessment roll by adjusting individual assessments." (Cal. Const., art. XIII, § 16.) Accordingly, "while sitting as a board of equalization, the county board of supervisors is a constitutional agency exercising quasi-judicial powers delegated to the agency by the Constitution" (*Westlake Farms, Inc.* v. *County of Kings* (1974) 39 Cal.App.3d 179, 185 [114 Cal.Rptr. 137]) with "special expertise in property valuation." (*Westinghouse Elec. Corp.* v. *County of Los Angeles* (1974) 42 Cal.App.3d 32, 42, fn. 6 [116 Cal.Rptr. 742].) In light of the semi-judicial status of local boards, "their factual determinations are entitled on appeal to the same deference due a judicial decision, i.e., review under the substantial evidence standard." (*Cochran* v. *Board of Supervisors* (1978) 85

Cal.App.3d 75, 80 [149 Cal.Rptr. 304].) Early statements that factual findings made by local boards are "final and conclusive" (*Universal Cons. Oil Co.* v. *Byram* (1944) 25 Cal.2d 353, 362 [153 P.2d 746]; accord *Flying Tiger Line, Inc.* v. *County of L. A.* (1958) 51 Cal.2d 314, 321-322 [333 P.2d 323]) have been supplanted by the substantial evidence test that tolerates a very limited reweighing of the evidence heard by the local board. (See *Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 22-23 [127 Cal.Rptr. 154, 544 P.2d 1354]; *County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 554-555 [195 Cal.Rptr. 895].)

On the other hand, courts are authorized to conduct an independent reassessment "when a board of equalization purports to decide a question of law." (*Board of Supervisors* v. *Archer* (1971) 18 Cal.App.3d 717, 724 [96 Cal.Rptr. 379]; accord *Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 474 [112 Cal.Rptr. 327].) ■ A board's "arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature" are legal matters subject to judicial correction. (See *De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 564 [290 P.2d 544]; accord *Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d 14 at p. 22.) ■ Finally, interpretation of statutes and administrative regulations are quintessential issues of law. (See *Delta Air Lines, Inc.* v. *State Bd. of Equalization* (1989) 214 Cal.App.3d 518, 525 [262 Cal.Rptr. 803].)

■ The trial court's statement of decision does not explicitly identify the basis for the court's determination why the board's decision concerning the stipulation could not stand. There appear to be two possible rationales. Each is sound.

First, the trial court could have concluded as a matter of law that the written stipulation was not ambiguous.[3] The stipulation (which is reproduced as an appendix to this opinion) is subject to the same rules of construction applied to contracts. (See *J. C. Penney Co.* v. *Superior Court* (1959) 52 Cal.2d 666, 669 [343 P.2d 919]; *Imperial Ins. Co.* v. *California Casualty Indem. Exchange* (1984) 158 Cal.App.3d 540, 546 [204 Cal.Rptr. 819].) "Whether a contract . . . is clear and unambiguous is a question of law, not of fact." (*Madison* v. *Superior Court* (1988) 203 Cal.App.3d 589, 598 [250 Cal.Rptr. 299]; accord *Brant* v. *California Dairies, Inc.* (1935) 4 Cal.2d 128, 133 [48 P.2d 13]; *Hillman* v. *Leland E. Burns, Inc.* (1989) 209 Cal.App.3d 860, 866 [257 Cal.Rptr. 535].) The stipulation is conspicuous

---

[3] We agree with the trial court's conclusion that "as a matter of law . . . [section 1604(c)] requires that any agreement for the extension of time for hearing must be a written agreement." The plain language of the statute leaves no room for any other interpretation. (Cf. *Estate of MacDonald* (1990) 51 Cal.3d 262 [272 Cal.Rptr. 153, 794 P.2d 911].)

for the complete absence of any connection with Shell. The document's caption refers only to Grace. The text of the stipulation recites the mutual agreement "by and between the undersigned parties, that the time for hearing on the applications for reduction in assessments *submitted by Grace . . .* is extended pursuant to subdivision (c) of Section 1604 . . . ." (Italics added.) The reference to "the undersigned parties" naturally directs attention to the signatures appended at the end of the stipulation. The signatures found are those of the board's chairman and John MacMeeken, the latter adding in his own handwriting that he was signing in his capacity as "Counsel for Grace Geothermal Corporation, Taxpayer." There is no place indicated for Shell's signature, nor is there a signature by anyone purporting to act on Shell's behalf. The stipulation also recites a further mutual agreement that a hearing would be held within 60 days upon "either party" giving written notice. The use of the word "either" leads to the natural conclusion that the only parties to the agreement were "the undersigned parties"—Grace and the board. This is strong support for the trial court determining as a matter of law that the stipulation was unambiguous and limited to Grace and the board.

There is a second, equally plausible course of reasoning which the trial court might have followed. The court could have determined that extrinsic evidence was properly admitted by the board for the purpose of demonstrating whether the nonintegrated stipulation was reasonably susceptible to the county's interpretation that Shell was also a party to the agreement. (See *Tahoe National Bank* v. *Phillips* (1971) 4 Cal.3d 11, 22 [92 Cal.Rptr. 704, 480 P.2d 320]; *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37-40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 225-228 [65 Cal.Rptr. 545, 436 P.2d 561].) If this is true, the issue would then be the parties' intent at the time the stipulation was drafted and signed. Intent being a question of fact (*Walsh* v. *Walsh* (1941) 18 Cal.2d 439, 444 [116 P.2d 62]; *Brawthen* v. *H & R Block, Inc.* (1972) 28 Cal.App.3d 131, 138 [104 Cal.Rptr. 486]), and the board having found on that question against Shell, the trial court would then be limited to establishing whether that finding was supported by substantial evidence in the record compiled before the board.

In addition to what has already been said about the writing itself (which was, of course, a part of the board's record), the extrinsic evidence heard by the board only serves to further impeach its determination that Shell was precluded from invoking section 1604(c) because it was a party to the written extension.[4] Because the writing was drafted by the county,

---

[4] After matters had reached the trial court, the county couched this argument in terms of estoppel and unclean hands. The court found against the county on both of these issues. The county does not challenge these findings on this appeal.

ambiguities will be resolved against the county. (Civ. Code, § 1654; *Tahoe National Bank* v. *Phillips, supra*, 4 Cal.3d 11 at p. 20.) The subject of the extension is the "applications for reduction of assessment," each of which is specified to have been filed "September 15, 1983." The board found, on undisputed evidence, that the only applications filed on that date were those of Grace; Shell had filed its applications "on or about September 9, 1983." There was evidence that the assessment reduction applications filed by Grace and Shell were collectively called "the Grace appeals." In light of the fact that the applications from both Grace and Shell had been consolidated for purposes of the board's action, this linguistic merger may reflect nothing more than a bureaucratic abbreviation. It is true that the attorney who signed the stipulation on behalf of Grace also represented Shell at the time, but this does not help the county. As previously noted, that attorney made a point of adding when he signed the stipulation that he did so as "Counsel for Grace," with no mention of Shell. The thought that the county believed the attorney was signing on behalf of both his clients is badly dented by this notation. The county's erroneous belief is further weakened by the testimony of both the county's counsel and assessor that they believed another attorney represented both Shell and Grace, when in fact that attorney at no time represented anyone other than Grace. The inescapable fact is that there is no evidentiary basis for the county's belief that there was mutual intent that Shell, as a party to the stipulation, had agreed to extending the time within which the board could act.

The element common to each of these possible grounds on which the trial court reached its decision is the absence between Shell and the county of that meeting of minds needed for an enforceable agreement. (See Civ. Code, §§ 1550, 1565, 1580; *Merced County Sheriff's Employee's Assn.* v. *County of Merced* (1987) 188 Cal.App.3d 662, 670 [233 Cal.Rptr. 519].) Shell is not bound by the stipulation because it was not a party to that agreement. (See *Galusha* v. *Fraser* (1918) 178 Cal. 653, 656 [174 P. 311]; *Frederickson & Watson Constr. Co.* v. *Dept. Pub. Wks.* (1972) 28 Cal.App.3d 514, 518 [104 Cal.Rptr. 421]; *Sessions* v. *Chrysler Corporation* (9th Cir. 1975) 517 F.2d 759, 760 [applying California law].) Either or both of the grounds discussed directly or indirectly implicates an error of law[5] that may have been accepted by the trial court. Either or both supports the trial court's decision to

---

[5] In deciding how the stipulation should be construed when there was no conflict in the extrinsic evidence (as opposed to conflicting inferences that might be drawn from that evidence), the board purported to resolve an issue of law. (See *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434, 445 [91 Cal.Rptr. 6, 476 P.2d 406]; *Stadium Concessions, Inc.* v. *City of Los Angeles* (1976) 60 Cal.App.3d 215, 218 [131 Cal.Rptr. 442]; 2 Ehrman & Flavin, Taxing California Property (3d ed. 1989) § 30.10, pp. 31-32.) The status of that determination is not altered even when made in the form of factual findings. (See *Cochran* v. *Board of Supervisors, supra*, 85 Cal.App.3d 75 at p. 80; *Board of Supervisors* v. *Archer, supra*, 18 Cal.App.3d 717 at p. 723.)

overturn the board's contrary determination. Each is a separate and independent ground for our decision to uphold the trial court.

## II

■ Having thus failed to establish that the board was empowered to decide Shell's applications because the stipulation extended the period for that decision, the county asks us to conclude that the trial court erroneously construed section 1604(c). The trial court enforced the statute according to its plain terms—it being undisputed that the board did not hear evidence on Shell's applications, section 1604(c) required that "the taxpayer's opinion of market value as reflected on the application for reduction in assessment . . . shall prevail as the basis upon which taxes are to be levied." The county contends that its use of the mandatory "shall" notwithstanding, section 1604(c) is only "directory" because "it was enacted to ensure the orderly and timely conduct of business by the Board." This contention, which involves a pure issue of law that courts review independently of administrative action (see *Estate of Madison* (1945) 26 Cal.2d 453, 456 [159 P.2d 630]; *Delta Air Lines, Inc.* v. *State Bd. of Equalization, supra,* 214 Cal.App.3d 518 at pp. 524-525; *West* v. *State of California* (1986) 181 Cal.App.3d 753, 762 [227 Cal.Rptr. 16]), is untenable.

The essence of this issue is to decide whether section 1604(c) commands an obligatory procedure or merely exhorts a "directory" duty that a county board of equalization should follow. (See *People* v. *McGee* (1977) 19 Cal.3d 948, 958-959 [140 Cal.Rptr. 657, 568 P.2d 382]; *Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606].) Our Supreme Court has explained what is the process for determining whether a provision should be given "directory" or "mandatory" effect. "In order to determine whether a particular statutory provision . . . is mandatory or directory, the court, as in all cases of statutory construction and interpretation, must ascertain the legislative intent. In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. When the object is to subserve some public purpose, the provision may be held directory or mandatory as will best accomplish that purpose, and the courts will look to see whether the provision is of the essence of the thing to be accomplished. While time provisions are often held directory, they will be considered mandatory if the language contains negative words or shows that the designation of the time was intended as a limitation of power, authority or right." (*Pulcifer* v. *County of Alameda* (1946) 29 Cal.2d 258, 262 [175 P.2d 1] [citations omitted]; accord *Morris* v. *County of Marin, supra,* at pp. 909-910.) This general approach is

augmented by a special analytical factor. ■ "[A]ll proceedings in the assessment of property for taxation and all proceedings in the levying and collection of taxes are *in invitum*[6] and are to be strictly construed in favor of the taxpayer . . . . It is a well-settled rule of construction, applicable to tax statutes, that only those provisions enacted for the benefit of the taxpayer are mandatory, while provisions enacted to secure the orderly conduct of business are merely directory." (*Ryan* v. *Byram* (1935) 4 Cal.2d 596, 603 [51 P.2d 872].)

■ Examination of the text of section 1604(c) discloses that virtually all discernible indicia point to the conclusion that it is indeed mandatory. The most notable feature of the statute's express language is its use of the word "shall," which the Legislature has declared to be mandatory. (Rev. & Tax. Code, § 16.) This shows that something more than a hortatory admonition was intended. (See *Cake* v. *City of Los Angeles* (1913) 164 Cal. 705, 710 [130 P. 723].) Section 1604(c) is also explicit with respect to "the nature and character of the act to be done, and . . . the consequences which [will] follow the . . . failure to do the particular act at the required time." (*Pulcifer* v. *County of Alameda, supra,* 29 Cal.2d 258 at p. 262.) The statute explicitly states what shall be done to remedy undue delay. The presence of such an enforcement mechanism is further evidence that section 1604(c) goes beyond directory to mandatory. (See *Morris* v. *County of Marin, supra,* 18 Cal.3d 901 at p. 910 [text & fn. 5]; *Gowanlock* v. *Turner* (1954) 42 Cal.2d 296, 301 [267 P.2d 310].) The sanction for noncompliance so well delineated goes past "secur[ing] the orderly conduct of business" or designating " 'a guide in orderly proceedings' " (*Ryan* v. *Byram, supra,* 4 Cal.2d 596 at pp. 603, 605) and amounts to the withdrawal of a board's power to proceed otherwise. (See *Pulcifer* v. *County of Alameda, supra; Cake* v. *City of Los Angeles, supra,* at p. 709; *People* v. *Lake County* (1867) 33 Cal. 487, 492.) The existence of the sanction comports with the general approach to the tax-exaction system: "As any tax proceeding is *in invitum* in nature [see footnote 6 and accompanying text, *ante*], each step must be taken in compliance with law or the proceeding is void. The equalization stage is no exception to this rule." (*Universal Cons. Oil Co.* v. *Byram, supra,* 25 Cal.2d 353 at p. 361; accord *Flying Tiger Line, Inc.* v. *County of L. A., supra,* 51 Cal.2d 314 at p. 321.)

Upon examination of the text, the legislative intent behind section 1604(c) is inescapable. The purpose of this statute is obvious: to expedite processing of assessment reduction applications so that those who seek reductions in the amount of taxes already paid are not cast into a bureau-

---

6"Against an unwilling party; against one not assenting. A term applied to proceedings against an adverse party, to which he does not consent." (Black's Law Dict. (5th ed. 1979) p. 704, col. 2.)

cratic limbo where there is no light at the end of the administrative tunnel. Although delay in processing such applications does not "subserve [any] public interest" (*Pulcifer* v. *County of Alameda, supra,* 29 Cal.2d 258 at p. 262), the unambiguous emphasis of section 1604(c) is to ease the burden to the taxpayer caused by administrative delay extending beyond the period established by the Legislature. The premise of the statute is that delay disadvantages taxpayers who are denied prompt return of taxes they have already paid, but works to the distinct advantage of taxing authorities who can forestall having to return the taxes they have already collected. Section 1604(c) is thus clearly enacted for the benefit of the taxpayer (see *Ryan* v. *Byram, supra,* 4 Cal.2d 596 at p. 603), not the tax collector. To facilitate this goal, the statute specifies a time period for action, and grants the remedy to the taxpayer whose application is delayed beyond the time deemed reasonable by the Legislature. It should be apparent that in enacting section 1604(c) the Legislature gave real teeth to its deadline for administrative action. All of the accepted indicia point to the conclusion that section 1604(c) establishes a mandatory duty, not a procedural nicety that a county board of equalization may disregard without consequence. (See *French* v. *Edwards* (1872) 80 U.S. 506, 511 [20 L.Ed.702, 703]; *Ryan* v. *Byram, supra,* at pp. 604-605.) In light of this conclusion, there can be no disagreement with the trial court enforcing section 1604(c) according to its plain language.

## III

There remains only the county's contention that section 1604(c) is unconstitutional in that (1) "it permits property to be taxed using a standard of valuation other than that prescribed by the constitution" (see Cal. Const., art. XIII, § 1); (2) "it allows an unconstitutional grant of a partial or complete exemption of property from taxation" (see *ibid.*); and (3) "the Legislature has unlawfully delegated the equalization authority of the county board of equalization to the taxpayer." Acknowledging that its failure to raise these issues at any point in the course of the extensive proceedings conducted before the board and the trial court would ordinarily be treated as a waiver of its right to appellate review, the county nevertheless urges us to exercise our discretion to reach the merits of its contention because it involves only a question of law that is of significant public interest. (See *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512]; *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 4-5 [97 Cal.Rptr. 431].)

The first and second of the county's particular objections involve pure issues of law only if they are considered as presented in the county's briefs. The county does not attack the method of valuation used by Shell to com-

pute the assessable value of its former property interests in Lake County, nor does the county assert that the valuation method used by Shell resulted in either a complete or a partial exemption of taxable property. Stripped from the actual reality of the record, the county's claims on these points inhabit the realm of purest speculation. The public interest in having the county's claims adjudicated appears dubious. From the dearth of reported decisions concerning the application of section 1604(c), it is reasonable to accept that the statute is being observed without incident. There is consequently no basis for assuming that taxpayers and county boards of equalization throughout California are eagerly anticipating judicial answers to the county's belatedly conceived constitutional arguments. In light of these circumstances we decline to exercise our discretionary power to overlook the county's history of silent inaction.

The judgment is affirmed.

Perley, J., and Reardon, J., concurred.

APPENDIX